E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ELIA HERRERA (Cal. Bar No. 293278)
Assistant United States Attorney
International Narcotics, Money Laundering,
and Racketeering Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2024
     Facsimile: (213) 894-0141
     E-mail:   elia.herrera@usdoj.gov

Attorneys for Applicant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| IN RE: CELLULAR TELEPHONES | No. **2:24-MJ-01782** |
|---|---|
| | GOVERNMENT'S *EX PARTE* APPLICATION FOR A WARRANT AUTHORIZING THE DISCLOSURE OF HISTORICAL AND PROSPECTIVE CELL SITE AND PHONE LOCATION INFORMATION, AND REQUEST TO SEAL; AFFIDAVIT OF SPECIAL AGENT TSOLER KOJAYAN |
| | **(UNDER SEAL)** |

The United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby applies for a warrant requiring cellular telephone service providers to furnish the Federal Bureau of Investigation (the "Investigating Agency") with information relating to the following cellular telephones:

    a.   213-590-7227, a cellular telephone issued by AT&T Wireless ("Carrier #1"), with International Mobile Subscriber Identity ("IMSI") Number 310280101945169 and International Mobile

Equipment Identity ("IMEI") Number 358390901312408, subscribed to PREPAID CUSTOMER[1], 3962 Whittier Blvd., Los Angeles, CA, 90023 and believed to be used by Alex Anthony AVILA ("AVILA"), also known as ("aka") "Tank," (**"Subject Telephone 1"**); and

   b. 213-466-9923, a cellular telephone issued by T-Mobile Wireless ("Carrier #2"; and, together with Carrier #1, collectively referred to as the "Carriers"), with IMSI 310240450799454 and IMEI 356915090267900, subscribed to unknown customer[2], and believed to be used by Alex FLORES ("FLORES"), (**"Subject Telephone 2"**; and, together with **Subject Telephone 1,** collectively referred to as the **"Subject Telephones"**).

Specifically, authorization is sought to obtain historical location information related to the use of the **Subject Telephones** from March 10 through March 27, 2024 and prospective location information related to the use of the **Subject Telephones** for a period of 45 days from the date of this application, that is, until May 12, 2024 including: (1) information reflecting the location of cellular towers (cell-site and sector/face) interacting with the **Subject Telephones**, including call detail, text, and data information ("Cell-site Information"), and (2) data collected by the Carriers reflecting the physical location of the **Subject Telephones**, including E-911 Phase II data, latitude and longitude data, and/or

---

[1] Subscriber information for **Subject Telephone Number 1** is not known because telephone companies do not require the subscriber to provide identification when purchasing a prepaid cellular telephone because the fees are paid in advance.

[2] Subscriber information for **Subject Telephone Number 2** is not known because telephone companies do not require the subscriber to provide identification when purchasing a prepaid cellular telephone because the fees are paid in advance.

network timing information, including Sprint's Per Call Measurement Data, Verizon's Real Time Tool, AT&T's Network Event Location System and T-Mobile's True Call data, and all other records containing timing advance measurements and distance-to-tower measurements for all technologies (CDMA2000, GSM, UMTS, LTE, 5G-NR) (collectively, "Phone Location Information"), along with any other associated data that was collected by the Carriers, but not including the contents of any communication.

The application is made in connection with an investigation of offenses committed by AVILA, FLORES, and others known and unknown (the "Target Subjects"), specifically, violations of 21 U.S.C. § 841(b)(1)(A) (Conspiracy to Distribute Illegal Narcotics for Sale); 18 U.S.C. § 1955 (Illegal Gambling); and 18 U.S.C. § 922(g) (Felon in Possession of Firearms and Ammunition) (the "Target Offenses"), and is based upon the attached agent affidavit.  There is probable cause to believe that federal crimes are being committed and that the information likely to be received concerning the approximate location of the **Subject Telephones** will constitute or yield evidence of those crimes.

The information sought by this application, which is acquired in the first instance by the Carriers, is sought based on 18 U.S.C. § 2701 et seq. (the "Stored Communications Act").  The Stored Communications Act provides:

> A governmental entity may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only[3] when the governmental entity --

---

[3] This section also provides other methods to compel disclosure, including via subpoena or court order.  However, the government in

(A)   obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction[.][4]

18 U.S.C. § 2703(c)(1); see also Carpenter v. United States, 138 S.Ct. 2206 (2018) (holding that a warrant is required to obtain seven or more days' worth of historical cell-site information).[5]

Prospective information is also sought based on the authority of 18 U.S.C. § 3121 et seq. (the "Pen Register Statute").[6]  The

---

this case is proceeding under the highest threshold, that is, obtaining a warrant as described in § 2703(c)(1)(A).

[4] This Court is a "court of competent jurisdiction" because it is a "district court of the United States (including a magistrate judge of such a court) . . . that . . . has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  This is true even if the subject of the investigation, and/or his or her phone, is in another district.  See, e.g., United States v. Ackies, 918 F.3d 190, 201-02 (1st Cir. 2019) (finding in the context of a warrant issued in one district for location information regarding phones physically located in another district that § 2703's plain text and structure, supported further by legislative history and Congressional intent, make clear that § 2703 permits searches not governed by Rule 41's geographic limitations).

[5] The definition of terms in the Stored Communications Act makes clear that the "record or other information" that a court may order a provider to disclose to the government under Section 2703(c)(1)(A) includes both cell site and other location information.  First, the Stored Communications Act expressly adopts the definition of statutory terms set forth in 18 U.S.C. § 2510.  See 18 U.S.C. § 2711 ("As used in this chapter. . . (1) the terms defined in section 2510 of this title have, respectively, the definitions given such terms in that section").  Thus, the term "provider of electronic communication service" used in Section 2703(c) covers cellular telephone service providers, because 18 U.S.C. § 2510(15) defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  Further, cell site and Phone Location Information is "a record or other information pertaining to a subscriber to or customer of" an electronic communications service – another term used in Section 2703(c) – because that information is collected and stored by cellular telephone service providers.

[6] 18 U.S.C. § 3127(3) defines "pen register" as "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any

4

government therefore also complies with the provisions of that statute, including by providing the required certification by the attorney for the government at the end of this application. Pursuant to the Pen Register Statute, upon an application made under 18 U.S.C. § 3122(a)(1) a court "shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation."  18 U.S.C. § 3123(a)(1).[7]

Cellular telephone companies routinely create and maintain, in the regular course of their business, records of information concerning their customers' usage of particular cell towers.  For each communication a customer makes or receives, these records typically include (1) the date and time of the communication; (2) the telephone numbers involved; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.  The records may also, but do not always, specify a particular sector of a cell tower used to transmit a communication.  Cell-site

---

communication."  A "trap and trace" device is similarly defined for any device or process which captures incoming data.  See 18 U.S.C. § 3127(4).

[7] While 47 U.S.C. § 1002, which is part of the Communications Assistance for Law Enforcement Act of 1994 ("CALEA"), would preclude seeking physical location information based on the Pen Register Statute alone, the Stored Communications Act provides the requisite additional authority for this Court to authorize the production by a Carrier of cell-site information to the government.

Information is useful to law enforcement because of the information it provides about the general location of a cell phone when a communication is made.

Cellular telephone companies also routinely create and maintain, in the regular course of their business, records of information concerning their customers' usage that includes data reflecting the physical location of the phones themselves. Cellular telephone companies are required by the Federal Communications Commission to be able to provide latitude, longitude, and altitude information for telephones that call 911. This information is referred to as E-911 Phase II information. Cellular providers have been required to provide some form of E-911 data since approximately 1999, before the rollout of 3G cellular networks in the United States. Historically, cellular providers relied on Global Positioning System ("GPS") chips in the phone handsets themselves for the location information. Cellular providers could, in response to a warrant, query a phone on their network about its location and receive GPS information from the handset.

Cellular providers are now able to determine the latitude, longitude, and altitude of phones connected to their networks based on routine signaling information between the phones and the network towers. No query to the phone's GPS chip is necessary for the provider to collect this location information. Indeed, that information is collected simply by the fact of the phone being connected to the network and is a necessary part of the phone's operation on the cellular provider's network. This data is collected in the ordinary course of the provider's business. Cellular providers use a variety of terms to refer to this network

timing advance or distance-to-tower network information, including Sprint's Per Call Measurement Data, Verizon's Real Time Tool, AT&T's Network Event Location System, and T-Mobile's True Call.  Carriers are therefore able to provide this data at regular intervals to law enforcement for both historical and prospective service.

Pursuant to 18 U.S.C. § 2705(b), this application requests that the Court enter an order commanding the Carriers not to notify any person, including the subscribers of the **Subject Telephones**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carriers comply with the warrant or such later date as may be set by the Court upon application for an extension by the United States, for the reasons outlined in the attached agent affidavit.

This application also seeks an order that (1) authorizes the disclosure of not only information with respect to the **Subject Telephones**, but also with respect to any changed telephone number(s) assigned to an instrument bearing the same ESN, IMSI, or IMEI (hereinafter "unique identifying number") as the **Subject Telephones**, or any changed unique identifying number subsequently assigned to the same telephone number as the **Subject Telephones**, or any additional changed telephone number(s) and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same wireless telephone account number as the **Subject Telephones** within the period of disclosure authorized by the warrant; and (2) orders the Investigating Agency to reimburse the applicable cellular telephone service provider for its reasonable

expenses directly incurred in providing the requested information and any related technical assistance.

Finally, this application requests that it, the proposed warrant that has been concurrently lodged, and the return to the warrant be sealed by the Court until such time as the Court directs otherwise or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel. Allowing disclosure to the public at large would likely jeopardize the ongoing investigation for the reasons outlined in the attached agent affidavit.

Dated: March 28, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

*/s/ Elia Herrera*
_____
ELIA HERRERA
Assistant United States Attorney

Attorneys for Applicant
UNITED STATES OF AMERICA

<u>CERTIFICATION</u>

In support of this application, and pursuant to 18 U.S.C. § 3122, I state that I, ELIA HERRERA, am an "attorney for the Government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.  I certify that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by the Investigating Agency of the Target Subjects for violations of the Target Offenses.

I declare under penalty of perjury under the laws of the United States of America that the foregoing paragraph is true and correct.


*/s/ Elia Herrera*

March 28, 2024
_____
DATE

_____
ELIA HERRERA
Assistant United States Attorney
International Narcotics, Money Laundering,
and Racketeering Section

<u>AFFIDAVIT</u>

I, Tsoler Kojayan, being duly sworn, declare and state as follows:

I.   <u>INTRODUCTION</u>

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2010.  I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.   I am currently assigned to a Criminal Gang Enterprise Squad at the Los Angeles Field Office of the FBI, which investigates criminal gang activity.  I am also a member of the FBI Los Angeles Metropolitan Task Force on Violent Gangs ("LAMTFVG"), a multi-agency federal, state, and local gang task force.

3.   As an SA, I have participated in investigations of various crimes, including assault, murder, gang activity, and firearms and narcotics trafficking.  For the past thirteen years, I have primarily investigated violent street gangs involved in narcotics distribution crimes, gun crimes, racketeering crimes, and criminal conspiracies.  I have also investigated the Mexican Mafia ("EME") prison gang -- its crimes, its members, and its associates -- and have interviewed EME-affiliated gang members regarding the organization's structure, rules, goals, and activities.

4.   Throughout my investigations, I have used a variety of law enforcement techniques, including physical and electronic surveillance, controlled drug and gun buys, interviews of witnesses

2

and subjects, use of confidential informants, and execution of search warrants. I have also been the affiant in Title III applications, monitored Title III communications, and conducted surveillance in conjunction with wiretap investigations.

5. As an SA, I have received training, both formal and informal, in investigating federal crimes, including federal narcotic, conspiracy, and racketeering crimes. Throughout my law enforcement career, I have discussed gangs, gang culture, and gang operations with both experienced law enforcement officers and knowledgeable confidential sources.

6. Through my experience and training, I have also become familiar with the illicit manner in which firearms are acquired and controlled substances are imported, manufactured, distributed, and sold. I have become familiar with the efforts of individuals engaged in the importation, smuggling, manufacturing, distribution, and sale of firearms to avoid detection and apprehension by law enforcement officers.

## II. PURPOSE OF AFFIDAVIT

7. This affidavit is made in support of an application for a warrant authorizing the disclosure of Cell-site Information and Phone Location Information (as defined in the application), including historical information from March 10, 2024 through March 27, 2024, and prospective information for a period of 45 days from the date of this application, that is, May 12, 2024 for the following cellular telephones:

a. 213-590-7227, a cellular telephone issued by AT&T Wireless ("Carrier #1"), with International Mobile Subscriber Identity ("IMSI") Number 310280101945169 and International Mobile

Equipment Identity ("IMEI") Number 358390901312408, subscribed to PREPAID CUSTOMER[1], 3962 Whittier Blvd., Los Angeles, CA, 90023 and believed to be used by Alex Anthony AVILA ("AVILA"), also known as ("aka") "Tank," (**"Subject Telephone 1"**); and

b.   213-466-9923, a cellular telephone issued by T-Mobile Wireless ("Carrier #2"; and together with Carrier #1, collectively referred to as the "Carriers"), with IMSI 310240450799454 and IMEI 356915090267900, subscribed to unknown customer[2], and believed to be used by Alex FLORES ("FLORES") (**"Subject Telephone 2"**; and, together with **Subject Telephone 1**, collectively referred to as the **"Subject Telephones"**).

8.   As described more fully below, I respectfully submit there is probable cause to believe that Cell-site Information and Phone Location Information likely to be received concerning the approximate location of the **Subject Telephones** will constitute or yield evidence of violations of 21 U.S.C. § 841(b)(1)(A) (Conspiracy to Distribute Illegal Narcotics for Sale); 18 U.S.C. § 1955 (Illegal Gambling); and 18 U.S.C. § 922(g) (Felon in Possession of Firearms and Ammunition) (the "Target Offenses"), that are being committed by AVILA, FLORES, and others known and unknown (the "Target Subjects").

9.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information

---

[1] Subscriber information for **Subject Telephone Number 1** is not known because telephone companies do not require the subscriber to provide identification when purchasing a prepaid cellular telephone because the fees are paid in advance.

[2] Subscriber information for **Subject Telephone Number 2** is not known because telephone companies do not require the subscriber to provide identification when purchasing a prepaid cellular telephone because the fees are paid in advance.

obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III. STATEMENT OF PROBABLE CAUSE

10.   In January 2024, the Los Angeles County Sheriff's Department ("LASD") informed me that a "casita," was being operated by Pico Viejo gang members, AVILA, John Paul REDONDO ("REDONDO"), aka "Sporty," and others, at 4126 Whittier Blvd., East Los Angeles, Los Angeles County, CA (the "Casita").  Pico Viejo is a Southern California Hispanic criminal street gang which originated in the City of Pico Rivera within Los Angeles County, in the late 1960s. Pico Viejo is affiliated with the Mexican Mafia prison gang.  Pico Viejo members are known to be violent and involved in a variety of crimes, including but not limited to murders, assaults, narcotics distribution, firearms possession, and robberies.  Based on my training and experience, I know that casitas are dwellings in which there are often illegal narcotics sales, firearms, gambling, and prostitution and that, generally, proceeds from casitas and other illicit activities such as distribution of narcotics, are funneled to the Mexican Mafia[3], either directly or through facilitators.

---

[3] Based on my training and experience, I know the Mexican Mafia ("EME") is a prison gang which controls the operations and activities of Surenos, Southern California gangs, and collects

11.   On or about January 5, 2024, a surveillance operation was conducted at the Casita by members of the LAMTFVG and LASD.  At the direction of the FBI, a Confidential Human Source[4] ("CHS") was sent to the Casita.  The CHS was provided with a covert recording device, a transmitter, and money.  Based on my review of the recording and report of the CHS' interview after the operation, while at the Casita, CHS observed multiple gambling machines and several patrons. CHS purchased methamphetamine inside the Casita from "Chente," who was subsequently identified as Vicente Javier MACIAS ("MACIAS"). MACIAS walked over to AVILA, who went to a back room labeled "Staff Only," then called MACIAS over.  MACIAS exited the back room, walked back to CHS and provided CHS with $40 worth of suspected methamphetamine.

12.   On or about January 8, 2024, surveillance was established at the Casita.  Surveillance observed a Hispanic male, subsequently identified as FLORES, leave the Casita with multiple bags and enter a Nissan registered to AVILA.  Surveillance personnel observed FLORES drive from the Casita to a residence located at 1263 South Woods Avenue in Los Angeles (the "Woods Residence").  FLORES was observed carrying multiple bags from the Nissan into the Woods Residence.  A short time later, FLORES was observed leaving the Woods location with multiple bags, enter the Nissan and drive back to the "Casita," and enter the "Casita" with the bags.

---

"rent" and other illicit proceeds from its affiliated street gangs. Members of the EME rose from the ranks of various Surenos gangs.

[4] CHS has provided information to the FBI for approximately ten years, for which CHS has received monetary compensation.  CHS has no known pending investigations and has convictions for receiving stolen property and possession of narcotics for sales.  The information provided by CHS has been reliable and corroborated by other investigative methods.

13.   On or about January 16, 2024, search warrants[5] were executed at the Casita and the Woods Residence.  I was present at the Casita during the search warrant.  LASD personnel recovered three firearms, approximately 20 grams of suspected methamphetamine[6], digital scales, approximately $4,000 in US currency, multiple rounds of live ammunition, and five gambling machines.  A piece of notebook paper was located which had the words "7 pounds" and "1. 466.1," "2. 469.01," "3. 461.01," "4. 460.06," "5. 460.09," "6. 460.03," "7. 458.8," "Sporty ok," and "2 oz. given to T," among other things written on it.  Based on my training and experience, I believe "7 pounds," and the amounts listed for items 1 through 7 were the weights of each pound of narcotics.  I know based on my training and experience that one pound equals approximately 454 grams.  The above paper, the suspected methamphetamine, some of the currency, the firearms, ammunition, and scales were located in the back room labeled "Staff Only," which included a storage area and a bedroom area with a bed and, desk, and personal items such as clothing. Mail addressed to AVILA and paperwork with the word "Tank," AVILA's gang moniker, was also located in the bedroom area within the "Staff Only" room.  AVILA, REDONDO, FLORES, MACIAS, and others were at the

---

[5] On January 14, 2024, the Honorable Margaret M. Bernal, County of Los Angeles Judge for the Southeast (Norwalk) Judicial District of California, authorized a search warrant for 4126 Whittier Blvd, and 1263 S. Woods Ave., Los Angeles, and the persons of AVILA, REDONDO, FLORES, and others.

[6] The methamphetamine was scattered throughout the floor in between various boxes of sodas as though someone was attempting to discard it.  A plastic baggie with a large hole was located nearby. Based on my training and experience, based on the amount of methamphetamine recovered along with the scales, I believe this was a distribution amount of methamphetamine.

7

Casita.  AVILA was arrested by LASD during that operation, and
subsequently released on or about January 18, 2024.

14.  I reviewed recorded and monitored[7] calls from Los Angeles
County Jail from AVILA to his girlfriend, Terisa Gandara
("Gandara"), made on January 16, 2024 and January 17, 2024.  During
the calls, AVILA asked Gandara to "3-way Alex," Which I believe is
FLORES, based on my knowledge of the investigation.  During these
calls, AVILA and FLORES discussed the search warrant at the Casita,
and AVILA directed FLORES what to do with the items located at the
Casita while AVILA was in custody.  For example, AVILA told FLORES
to gather his personal belongings and give them to Gandara.
Additionally, he told FLORES to have his truck taken to "Sporty's"
(REDONDO) house.  AVILA also told FLORES to get a hold of "Josh" and
"Sporty" (REDONDO) and get "everything out of there ASAP."  I
reviewed Gandara's tolls at the dates and times of the jail calls
made by AVILA to Gandara and identified **Subject Telephone 2** as the
number being used by FLORES.

15.  LASD provided me with **Subject Telephone 1** as a phone
number being used by AVILA.  AVILA's tolls for **Subject Telephone 1**
reflect numerous calls prior to his arrest and upon his release to
**Subject Telephone 2**.  In addition, I reviewed recorded and monitored[8]
calls from Los Angeles County Jail from Randy AVALOS ("AVALOS"), aka
"Champ," a Pico Viejo gang member, to AVILA at **Subject Telephone 1**.
I recognized AVILA's voice, as the same voice I have heard during

---

[7] During these calls, there is a recording which is repeated
throughout the calls which states the phone call is being recorded.

[8] During these calls, there is a recording which is repeated
throughout the calls which states the phone call is being recorded.

the jail calls made by AVILA to Gandara and FLORES.  During this call, AVALOS and AVILA discussed a recent jail cell search of AVALOS at County Jail.  AVALOS told AVILA he flushed the narcotics down the toilet and asked AVILA for money to help pay the debt for the lost narcotics to an unspecified person.  AVILA told AVALOS of the recent search warrant at the Casita.

16.  On or about February 15, 2024, a surveillance operation was conducted at the Casita, and 11344 Howard St., Whittier, CA 90601 (the "Howard Residence"), residence of AVILA and Gandara. FLORES and two Unidentified Males ("UM") were observed leaving the Casita in a Penske moving truck and law enforcement officers followed them to the Dollar Self Storage, located at 8717 Pioneer Blvd., Santa Fe Spring, CA 90670.  AVILA and Gandara were seen at the Howard Residence, and then drove to the Dollar Self Storage, where law enforcement officers saw them meet with FLORES.  AVILA, FLORES, and the others were observed opening a storage unit.  FLORES was later observed leaving the self-storage unit and drive back to the Casita, where he and the UMs were observed taking items from the truck to the Casita.  FLORES was observed looking around on multiple occasions.  During this surveillance, AVILA was observed driving at high rates of speed, exceeding the speed limit on several occasions. For example, when AVILA and Gandara departed the Howard Residence to the Dollar Self Storage, AVILA made several turns, to include a sudden U-turn, initially driving away from the direction of the Dollar Self Storage.  His use of multiple turns, sudden U-turn, and driving at high rate of speed were indicative of counter surveillance measures.

17.   I reviewed rental documents for the truck (Penske) and storage unit (Dollar Self Storage).  Both the truck and storage unit were rented in AVILA's name.  **Subject Telephone 1** was listed as AVILA's contact number for the Penske truck rental.

18.   I seek prospective information via this application because this information will assist me in gathering evidence in the ongoing investigation I have described above in the following ways: (1) I am investigating a conspiracy, and determining concert of action and contact between the conspirators is of value to my investigation; (2) the information will enable me to identify members of the conspiracy that I have not previously identified; (3) the information will provide insight into the roles and actions of the members of the conspiracy, and the criminal conduct committed by the people being investigated; (4) it will provide information regarding whether the individuals being investigated meet or have contact prior to, or after, committing any criminal conduct; (5) it will more readily provide information about any victims of the criminal conduct; and (6) the information will often identify locations where evidence is stored and where search warrants may be appropriate.  Moreover, it will assist in targeting surveillance conducted in this case, and reduce the risk of being detected and revealing the nature or fact of the investigation.  People who are involved in criminal activity are often conscious of being followed and keep a close eye out for surveillance units.  The chance of being discovered increases with the more surveillance that is done and the closer the surveillance units must get to the target subjects.  Use of the prospective location information enables the investigative team to be more focused and judicious in its use of

surveillance to those times when it appears that events of significance are going to occur.  It also enables the investigative team the ability to conduct surveillance at a greater distance, because the fear of losing the target is reduced when surveillance is maintained via this information.

## IV.  GROUNDS FOR SEALING AND NONDISCLOSURE

19.  Based on my training and experience and my investigation of this matter, I believe that reasonable cause exists to seal this application and warrant, as well as the return to the warrant.  I also believe that reasonable cause exists, pursuant to 18 U.S.C. § 2705(b), to enter an order commanding the Carriers not to notify any person, including the subscribers of the **Subject Telephones**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carriers comply with the warrant or such later date as may be set by the Court upon application for an extension by the United States.  Accordingly, there is reason to believe that such notification will result in: (1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing the investigation.

## V.  CONCLUSION

20.  For all of the above reasons, there is probable cause to believe that the requested Cell-site Information and Phone Location Information related to the **Subject Telephones** will constitute or

yield evidence of violations of the Target Offenses committed by the Target Subjects.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 28 day of March, 2024.

_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

12